UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LISA BENDER,

        Plaintiff,

    v.

UNITED STATES POSTAL SERVICE,

        Defendant.

21-CV-924-LJV
DECISION & ORDER

On August 12, 2021, the plaintiff, Lisa Bender, commenced this action under the

Rehabilitation Act of 1973 ("Rehabilitation Act")[1] and Title VII of the Civil Rights Act of

1964 ("Title VII").  Docket Item 1.  She asserts claims for disability discrimination,

gender discrimination, and retaliation against the United States Postal Service ("USPS")

arising from her time working for USPS as a mail carrier.  *Id.*  On July 24, 2023, USPS

moved for summary judgment, Docket Item 17; on October 5, 2023, Bender responded,

Docket Item 20; and on October 18, 2023, USPS replied, Docket Item 21.

For the reasons that follow, USPS's motion for summary judgment is granted.

---

[1] Bender invokes the Americans with Disabilities Act of 1990 ("ADA").  *See* Docket Item 1 at ¶¶ 25-31.  Because postal workers are federal employees, however, *see, e.g.*, *Krul v. DeJoy,* 2023 WL 8449589, at *1-2 (N.D.N.Y. 2023), her disability discrimination claim properly arises under the Rehabilitation Act, *see Pierre v. Napolitano*, 958 F. Supp. 2d 461, 466 n.1 (S.D.N.Y. 2013) (explaining that the Rehabilitation Act is the "exclusive remedy" for a federal employee alleging disability discrimination because the federal government is not an "'employer' for purposes of the ADA" (citations omitted)).

## BACKGROUND[2]

Bender worked for USPS as a rural mail carrier at the United States Post Office in Attica, New York, from January 1998 until August 2020.  Docket Item 17-2 at ¶¶ 7, 10, 17; Docket Item 20-1 at ¶¶ 7, 10, 17.  Her responsibilities included sorting and organizing mail, loading mail on a vehicle, and delivering mail.  Docket Item 17-2 at ¶¶ 11-14; Docket Item 20-1 at ¶¶ 11-14.  Bender's lawsuit is based on two problems that she experienced during her employment with USPS: (1) issues relating to her health and (2) harassment by another USPS employee, Jesse Sarvis.

---

[2] On a motion for summary judgment, the court construes the facts in the light most favorable to the non-moving party.  *See Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011).  "Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by a correspondingly numbered paragraph in the opposing statement." Loc. R. Civ. P. 56(a)(1).  "[C]onclusory denials" of a moving party's factual assertions unsupported by "any record citations" are insufficient to contest those factual assertions. *See N.Y. State Teamsters Conf. Pension & Ret. Fund v. Express Servs., Inc.*, 426 F.3d 640, 648-49 (2d Cir. 2005) (concluding that district court "reasonably deemed [the moving party's] statement of facts to be admitted" because the nonmoving party "offered mostly conclusory denials of [the] factual assertions and failed to include any record citations").

The following facts, which are viewed in the light most favorable to Bender, are taken from USPS's statement of material facts, Docket Item 20-9; Bender's response to USPS's statement of material facts, Docket Item 20-1; and the documents incorporated by those statements.  Bender's response to USPS's statement of material facts denies many of USPS's factual assertions on the ground that she "does not have a sufficient basis to ascertain the truthfulness of [those] statement[s]."  *See id.* at ¶¶ 33, 63-65, 70, 73, 88-93, 105, 114-15, 117, 125-28, 132-33; *see also id.* at ¶ 135 (stating merely "Unknown").  But those conclusory denials, which are unsupported by citations to the record, do not controvert USPS's corresponding factual assertions, which are supported by appropriate citations.  *See Express Servs, Inc.*, 426 F.3d at 648-49; *see also* Docket Item 17-2 at ¶¶ 33, 63-65, 70, 73, 88-93, 105, 114-15, 117, 125-28, 132-33, 135. Accordingly, those facts are deemed admitted under Local Rule of Civil Procedure 56(a)(1) and *Express Services, Inc.*, 426 F.3d at 648-49.

## I.    HEALTH ISSUES

Bender suffers from "anxiety, emotional instability secondary to adjustment disorder, and post-traumatic stress disorder."  Docket Item 17-2 at ¶ 134; Docket Item 20-1 at ¶ 134.  As a result of those conditions, she is "unable to perform any of [her] work[-]related duties."[3]  Docket Item 17-2 at ¶ 135; Docket Item 17-11 at 9; *see* Docket Item 20-1 at ¶ 135.

One USPS supervisor, Shawna Gilmartin, described Bender as an "excellent" carrier who had "issues with attendance."  Docket Item 17-2 at ¶ 15; Docket Item 20-1 at ¶ 15.  More specifically, Gilmartin said that Bender "called in a lot" and that the two met "on some occasions to discuss . . . being regular in attendance."  Docket Item 17-2 at ¶ 16.  Bender explains that her attendance problems were caused by her "health issues," Docket Item 20-1 at ¶ 16, which she shared with Gilmartin in their meetings, Docket Item 17-12 at 13-14.

## II.    HARASSMENT BY SARVIS

During her employment with USPS, Bender had a series of unpleasant run-ins with Jesse Sarvis, a mail carrier who joined the Attica Post Office around 2014.  Docket Item 17-2 at ¶ 20; Docket Item 20-1 at ¶ 20.

---

[3] According to former Attica Postmaster Teresa L. Truglio, Docket Item 17-2 at ¶ 33, Bender never made "a reasonable accommodation request" to USPS regarding her medical conditions, *id.* at ¶ 136.  While Bender contends that an "accommodation request does not need to be made when the disability is obvious," she does not allege that she ever made a written or verbal request for accommodations.  *See* Docket Item 20-1 at ¶ 136.

### A.       The Initial Conflict

For the first few years that Bender and Sarvis worked together, the two were "friendly" and "civil."  Docket Item 17-2 at ¶¶ 42-44; Docket Item 20-1 at ¶¶ 42-44.  But in or about 2017, "Bender began having problems with Sarvis performing what is known . . . as a 'hand-off.'"  Docket Item 17-2 at ¶ 22; Docket Item 20-1 at ¶ 22.  The hand-off, which was meant to occur daily, involved Sarvis's "bundl[ing]" and "hand[ing]" Bender mail for two addresses that previously had been on his route "but were then switched to Bender's route."  Docket Item 17-2 at ¶¶ 23-27; Docket Item 20-1 at ¶¶ 23-27.

Before Sarvis became responsible for the hand-off, Bender had "never had a problem with the 'hand-off' for the twenty years she had her route."  Docket Item 17-2 at ¶ 28; Docket Item 20-1 at ¶ 28.  But "[o]nce Sarvis started on his route, the 'hand-off' was late on a daily basis."  Docket Item 17-2 at ¶ 29; Docket Item 20-1 at ¶ 29.  In fact, "Sarvis often would not complete the 'hand-off' until after Bender had already left the Post Office to do her deliveries."  Docket Item 17-2 at ¶ 30; Docket Item 20-1 at ¶ 30.

Eventually, Sarvis began to give the hand-off to the "clerks," who would pass it on to Bender.  Docket Item 17-2 at ¶ 31; Docket Item 20-1 at ¶ 31.  According to USPS, Sarvis was told to go through the clerks to minimize his contact with Bender.  Docket Item 17-2 at ¶ 33; *see* Docket Item 20-1 at ¶ 33.  But that arrangement "did not resolve the issue" because Sarvis sometimes "would not bundle the mail properly" or "would put part of the 'hand-off' in one location and part of it in another location."  Docket Item 17-2 at ¶¶ 35-37; Docket Item 20-1 at ¶¶ 35-37.

The hand-off became so frustrating that Bender complained to "management," including Truglio and Daniel Kinyon, who succeeded Truglio as Attica Postmaster.  Docket Item 17-2 at ¶¶ 34, 38; Docket Item 20-1 at ¶ 38.  But after Bender complained,

4

the situation worsened because Sarvis intentionally tried to "bother" Bender and treated the hand-off like a "game."  Docket Item 17-2 at ¶¶ 39-40; Docket Item 20-1 at ¶¶ 39-40. The issues with the hand-off went on for a "few years," Docket Item 17-2 at ¶ 41; Docket Item 20-1 at ¶ 41, and caused Bender's and Sarvis's relationship to become "uncivil," Docket Item 17-2 at ¶ 45; Docket Item 20-1 at ¶ 45.

### B.    The Confrontation Escalates

In or about December 2018, Sarvis's confrontational behavior escalated:  When Bender came near him in the mail room, he would "slam[] plastic mail trays," Docket Item 17-2 at ¶ 51; Docket Item 20-1 at ¶ 51, and "turn the radio up very loud," Docket Item 17-2 at ¶ 52; Docket Item 20-1 at ¶ 52.  Bender believes that around that time, "Sarvis stole her 'red card,' a card that mail carriers display to show that they are out on delivery."  Docket Item 17-2 at ¶ 53; Docket Item 20-1 at ¶ 53.  And sometime before 2019, Sarvis whistled at Bender "between 15 and 20 times" in a sexual or flirtatious manner.  Docket Item 20-1 at ¶¶ 47-48 (citing Docket Item 17-4 at 44).

On one occasion, when Bender was talking with another coworker, Jeff Joya, sometime around February 2019, "Sarvis turned the radio up very loud."  Docket Item 17-2 at ¶ 54; Docket Item 20-1 at ¶ 54.  Joya asked Sarvis to lower the radio, and "Sarvis responded by talking to himself and cursing loudly."  Docket Item 17-2 at ¶ 54; Docket Item 20-1 at ¶ 54.  The same day, Sarvis "made the 'hand-off' late again." Docket Item 17-2 at ¶ 55; Docket Item 20-1 at ¶ 55.

Joya called Truglio to complain about Sarvis, Docket Item 17-2 at ¶ 56; Docket Item 20-1 at ¶ 56, and "[t]he next day, Truglio brought Joya, Sarvis, and Bender . . . into her office to give statements" about the incidents, Docket Item 17-2 at ¶ 57; Docket Item

20-1 at ¶ 57.  At one point "[w]hile Joya was in Truglio's office, Sarvis looked at Bender" and said "boom boom."  Docket Item 17-2 at ¶ 60; Docket Item 20-1 at ¶ 60.  Bender "immediately" reported the comment to Truglio because she understood it to be a "threat."  Docket Item 17-2 at ¶¶ 61-62; Docket Item 20-1 at ¶¶ 61-62.

According to USPS, Truglio contacted the labor relations and human resources departments "for guidance on how to handle Bender's complaints" about Sarvis.  Docket Item 17-2 at ¶ 63; *see* Docket Item 20-1 at ¶ 63.  Truglio also spoke to Sarvis, who contended that he had turned up the radio to hear the music and "denied saying 'boom boom' to Bender."  Docket Item 17-2 at ¶ 64; Docket Item 20-1 at ¶ 64.  To resolve at least part of the issue, Truglio instructed all Attica Post Office employees "that the preset volume on the radio was not to be adjusted."  Docket Item 17-2 at ¶ 65; see Docket Item 20-1 at ¶ 65.  But Truglio told Bender that USPS "could do nothing" about Sarvis's "boom boom" comment because "Bender could not prove that [it] meant anything."  Docket Item 17-2 at ¶ 66; Docket Item 20-1 at ¶ 66.

Truglio's attempts to resolve the problem did not work; in fact, things got worse. On April 23 and 24, 2019, Sarvis "quickly accelerated" his vehicle toward Bender—who was loading her vehicle on the loading dock—"in an . . . attempt to frighten" her.  Docket Item 17-2 at ¶ 67; Docket Item 20-1 at ¶ 67; *see* Docket Item 17-4 at 57-59.  On April 25, Bender did not enter the loading dock to test whether Sarvis would "accelerate[] or gun[]" his vehicle without her present.  Docket Item 17-2 at ¶ 68; Docket Item 20-1 at ¶ 68; *see* Docket Item 17-4 at 59.  Sarvis did not "gun" his vehicle, Docket Item 17-2 at ¶ 68; Docket Item 20-1 at ¶ 68; *see* Docket Item 17-4 at 59, suggesting that Sarvis had intended his rapid acceleration toward Bender as a "personal threat."  Docket Item 17-2

6

at ¶ 70; Docket Item 20-1 at ¶ 70.  Bender "immediately complained to Truglio" about Sarvis's conduct.  Docket Item 17-2 at ¶ 69; Docket Item 20-1 at ¶ 69.

According to USPS, when Truglio questioned Sarvis about "why he was revving the engine," Sarvis replied that his actions were not a threat because "he always gives the truck gas when he starts it to prevent it from stalling."[4]  Docket Item 17-2 at ¶ 70; *see* Docket Item 20-1 at ¶ 70.  Truglio shared Sarvis's explanation with Bender, but Bender "contended that Sarvis only revved his vehicle when she was near," Docket Item 17-2 at ¶¶ 71-72; Docket Item 20-1 at ¶¶ 71-72.  After that, Truglio told Sarvis and Bender that they should not load their vehicles at the same time.  Docket Item 17-2 at ¶ 73; *see* Docket Item 20-1 at ¶ 73.

### C.    Bender's Meeting with Truglio and Sarvis and Sarvis's Continued Harassment

In May 2019, Bender met with Truglio and Sarvis.  Docket Item 17-2 at ¶ 74; Docket Item 20-1 at ¶ 74.  Both sides agree that when the meeting began, "Bender asked Sarvis why he had a problem with her."  Docket Item 17-2 at ¶¶ 75, 78; Docket Item 20-1 at ¶¶ 75, 78.  But the parties' accounts of the meeting diverge after that.

According to Bender, Sarvis responded to her question "by lunging at Truglio" and calling Bender a "f[******] liar and a f[******] fake."  Docket Item 17-2 at ¶ 76; Docket Item 20-1 at ¶ 76.  She says that Truglio then "threatened Sarvis with termination if he continued to harass Bender."  Docket Item 17-2 at ¶ 77; Docket Item 20-1 at ¶ 77.

---

[4] Truglio had seen "other carriers . . . rev the engine when starting [USPS] vehicles," which "sometimes stall upon starting."  Docket Item 17-2 at ¶ 20.

Truglio's version of the meeting differs:  She says that after Bender asked Bender why he disliked her, Sarvis only "asked if he really had to be in there."  Docket Item 17-2 at ¶ 78.  She says that Sarvis then became irritated and called Bender a "f[******] fake and a f[******] liar" but that Bender "chuckled" at Sarvis's irritation.  *Id.*  Finally, Truglio says that she "advised" Bender and Sarvis that they must "work together" and "treat each other with respect" and that harassment or threats "would not be tolerated."  *Id.*

Despite Truglio's warnings, Sarvis's conduct continued.  On or about May 24, 2019, Bender saw Sarvis "lurk[ing] in a bank parking lot across from the Post Office" and staring at her "while she was unloading her vehicle."  Docket Item 17-2 at ¶ 93; *see* Docket Item 17-4 at 69-71; Docket Item 20-1 at ¶ 93.  Bender reported Sarvis's "creepy" behavior to either Truglio or Gilmartin.  Docket Item 17-4 at 69-72; *see* Docket Item 17-2 at ¶¶ 94-96; Docket Item 20-1 at ¶¶ 94-96.  A few days later, "Sarvis walked past Bender and glared at her with an angry look on his face."  Docket Item 17-2 at ¶ 102; Docket Item 20-1 at ¶ 102.

In July 2019, another USPS employee "witnessed Sarvis screaming and swearing to nobody while loading his [vehicle]," Docket Item 17-2 at ¶ 108; Docket Item 20-1 at ¶ 108, and Bender heard Sarvis "saying out loud 'fat, fugly, and fake'" while the two loaded their vehicles.  Docket Item 17-2 at ¶ 109; Docket Item 20-1 at ¶ 109.

In August 2019, "Sarvis banged a thick plastic mail tray on his cart" while he was "right behind" Bender, causing "a loud bang" "like a gunshot."  Docket Item 17-2 at ¶ 110; Docket Item 20-1 at ¶ 110; *see* Docket Item 17-3 at 86-87.  Bender became "upset" and developed neck pain and a headache as a result of the noise, so she left work.  Docket Item 17-4 at 87-89; *see* Docket Item 17-2 at ¶ 112; Docket Item 20-1 at

¶ 112.  "Bender then reported this incident to the local police."  Docket Item 17-2 at ¶ 113; Docket Item 20-1 at ¶ 113.  After Bender told her husband about the incident, he went to the Post Office looking for Sarvis.  Docket Item 17-4 at 89; *see* Docket Item 17-2 at ¶ 114; Docket Item 20-1 at ¶ 114.  But the United States Postal Inspection Service ultimately found that "there was no bullying or harassment" of Bender by Sarvis.  Docket Item 17-2 at ¶ 117; *see* Docket Item 17-8 (investigative report); *see also* Docket Item 20-1 at ¶ 117.

### D.    Sarvis's Interactions with Others and Arrest

Bender was not the only person to struggle with Sarvis.  Several other USPS employees were afraid of him as well, Docket Item 17-2 at ¶ 101; Docket Item 20-1 at ¶ 101, and once, "Gilmartin brought her dog into the [P]ost [O]ffice to protect herself from [him]," Docket Item 17-2 at ¶¶ 97, 99; Docket Item 20-1 at ¶¶ 97, 99.

USPS customers also took issue with Sarvis's conduct.  Docket Item 17-2 at ¶ 80; Docket Item 20-1 at ¶ 80.  They complained that he (1) swore and yelled "when a package would not fit in [a] mailbox," Docket Item 17-2 at ¶ 80; Docket Item 20-1 at ¶ 80; (2) was found sleeping in his mail truck, Docket Item 17-2 at ¶ 81, Docket Item 20-1 at ¶ 81; (3) "walked into a . . . customer's house uninvited," Docket Item 17-2 at ¶ 82; Docket Item 20-1 at ¶ 82; and (4) drove recklessly "while on the job," Docket Item 17-2 at ¶ 83; Docket Item 20-1 at ¶ 83.  And at some point, "Sarvis . . . drove his [USPS] vehicle onto the property of Attica High School and gave the middle finger to a female student."  Docket Item 17-2 at ¶ 84; Docket Item 20-1 at ¶ 84.  "Bender also believes that Sarvis gave the middle finger to his elderly female neighbor while on the job."  Docket Item 17-2 at ¶ 85; Docket Item 20-1 at ¶ 85.

9

Sarvis's objectionable behavior was not limited to his employment.  Apparently, he had "an ongoing dispute" with an ex-girlfriend and her son and "would drive by" his ex-girlfriend's home and workplace to "yell and swear" at her and her son.  Docket Item 17-2 at ¶ 86; Docket Item 20-1 at ¶ 86.  He harassed some of his neighbors in a similar manner, Docket Item 17-2 at ¶ 87; Docket Item 20-1 at ¶ 87, and the Attica Police Chief said that Sarvis "attempt[ed] to harass and intimidate" Attica Police Officers as well.  Docket Item 17-2 at ¶¶ 88-89; *see* Docket Item 20-1 at ¶¶ 88-89.

Sarvis's conduct even crossed the line into the criminal:  At some point, he was arrested for "theft of a toolbox."  Docket Item 17-2 at ¶ 106; Docket Item 20-1 at ¶ 106.  When Sarvis was arrested, "the police found narcotics in his pocket."  Docket Item 17-2 at ¶ 106; Docket Item 20-1 at ¶ 106.  Sarvis eventually was "prosecuted" and "sent to jail . . . for a few months."  Docket Item 17-2 at ¶ 107; Docket Item 20-1 at ¶ 107.

### E.    Sarvis's Return to Work

At some point, Gilmartin "tried to terminate Sarvis" based on his tardiness, reckless driving, and criminal conviction.  Docket Item 17-2 at ¶¶ 90-91, 119; Docket Item 20-1 at ¶ 119; *see* Docket Item 20-1 at ¶¶ 90-91.  But "the union for mail carriers fought to keep Sarvis employed," Docket Item 17-2 at ¶ 92; *see* Docket Item 20-1 at ¶ 92, so "[o]n or about April 1, 2020, Gilmartin informed Bender that Sarvis was out of jail . . . and would be returning to work," Docket Item 17-2 at ¶ 118; Docket Item 20-1 at ¶ 118.

After Sarvis returned to work, he took "an extremely long time loading his vehicle."  Docket Item 17-2 at ¶ 120; Docket Item 20-1 at ¶ 120.  According to Bender, Sarvis "intentionally" worked slowly to prevent Bender from loading her own vehicle

"because [USPS] management required them to load separately to avoid conflict." Docket Item 17-2 at ¶¶ 120-21; Docket Item 20-1 at ¶¶ 120-21.

On or about July 3, 2020, Sarvis "cleared his throat loudly" when "Bender passed near [him]." Docket Item 17-2 at ¶ 122; Docket Item 20-1 at ¶ 122. A few days later, on July 7, 2020, "Sarvis again 'gunned' his . . . vehicle in the loading dock area when Bender was nearby." Docket Item 17-2 at ¶ 123; Docket Item 20-1 at ¶ 123. Bender says that the same day, "Sarvis tried to run her off the road while they were in their respective vehicles performing their work duties." Docket Item 17-2 at ¶ 124; Docket Item 20-1 at ¶ 124. But an investigation "could not confirm Sarvis['s] running Bender off the road." Docket Item 17-2 at ¶¶ 127-28; *see* Docket Item 17-9 (investigative report); *see* Docket Item 20-1 at ¶¶ 127-28.

### F.   Bender's Departure from USPS

"On July 22, 2020, Bender's vehicle broke down while [she was] delivering her route and she called AAA for assistance." Docket Item 17-2 at ¶ 129; Docket Item 20-1 at ¶ 129. Bender's "anxiety increased exponentially" in the hours it took AAA to arrive, "and she told her manager that she needed to go home." Docket Item 17-2 at ¶ 130; Docket Item 20-1 at ¶ 130.

Bender's left her employment on August 4, 2020, after an interaction with Kinyon. Docket Item 17-2 at ¶ 131; Docket Item 20-1 at ¶ 131. According to Bender, Kinyon "unfairly assigned her a large number of catalogs and magazines to deliver that she believed her substitute . . . should have delivered the previous day." Docket Item 17-2 at ¶ 131; Docket Item 20-1 at ¶ 131. Bender felt that the assignment was retaliation "for complaining of Sarvis's discriminatory conduct." Docket Item 20-1 at ¶ 133. Kinyon, on

the other hand, says he did not have an opportunity to ask the substitute to deliver the magazines and that he told Bender she could deliver "just a few each day until they were gone."  Docket Item 17-2 at ¶ 132.  Bender "did not like that idea, walked out," and did not return.  *Id.*

## III.   BENDER'S ADMINISTRATIVE COMPLAINT

Bender contacted USPS's Equal Employment Opportunity ("EEO") office on August 18, 2020, and filed an administrative complaint on November 24, 2020, asserting "claims of gender discrimination, retaliation, and disability discrimination." Docket Item 17-2 at ¶¶ 138-41; Docket Item 20-1 at ¶¶ 138-41.  USPS dismissed Bender's complaint on May 14, 2021, Docket Item 17-2 at ¶ 143; Docket Item 20-1 at ¶ 143, and Bender commenced this action a few months later, Docket Item 1.

## <u>LEGAL PRINCIPLES</u>

"A motion for summary judgment may be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Soto v. Gaudett*, 862 F.3d 148, 157 (2d Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).  "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict,' *i.e.*, 'it is quite clear what the truth is,' and no rational factfinder could find in favor of the nonmovant."  *Id.* (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), then quoting *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 467 (1962)).  Conversely, "[s]ummary judgment should be denied if, when the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve

all material factual issues in favor of that party."  *Id.*  "In deciding such a motion, the court cannot properly make credibility determinations or weigh the evidence."  *Id.*

**DISCUSSION**

**I.      TITLE VII CLAIMS**

**A.      Statute of Limitations**

"Before bringing a federal lawsuit under Title VII, a federal government employee must timely exhaust the administrative remedies at [her] disposal."  *Tassy v. Buttigieg*, 51 F.4th 521, 530-31 (2d Cir. 2022) (citations and internal quotation marks omitted); *see Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 833 (1976) (observing that Title VII imposes "rigorous administrative exhaustion requirements and time limitations").  Postal workers, such as Bender, are federal government employees.  *See, e.g., Krul,* 2023 WL 8449589, at *1-2.

"EEOC regulations establish the applicable administrative procedures that a federal employee must exhaust prior to filing suit."  *Tassy*, 51 F.4th at 531 (citation and internal quotation marks omitted).  Under those regulations, "a claimant 'must initiate contact with an EEO counselor within 45 days of the date of the matter alleged to be discriminatory.'"  *Id.* (alterations omitted) (quoting 29 C.F.R. § 1614.105(a)(1)).  "This 45-day period serves as a statute of limitations; thus, as a general rule, claims alleging conduct that occurred more than 45 days prior to the employee's initiation of administrative review are time[ ]barred."  *Id.* (citation and internal quotation marks omitted).  "In considering the timeliness of discrete act claims, [the Second Circuit has] held that each actionable discrete act occurs on the day that it happened."  *Id.* (alteration, citation, and internal quotation marks omitted).

13

Bender contacted USPS's EEO office on August 18, 2020.  Docket Item 17-2 at ¶¶ 138-39; Docket Item 20-1 at ¶¶ 138-39.  Therefore, USPS says, "all of Bender's Title VII gender discrimination and retaliation claims must be dismissed as untimely except her claims relating to the incidents of July 7, July 22, and August 4, 2020"—that is, the only claims that accrued on or after July 4, 2020, which was 45 days before the date she contacted the EEO office.  Docket Item 17-1 at 6.

Bender responds that her discrimination and retaliation claims based on acts that occurred before July 4, 2020, are saved by the continuing violation doctrine, Docket Item 20 at 4-5, which "allows courts to consider conduct that would ordinarily be time barred as long as the untimely incidents represent an ongoing unlawful employment practice."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 107 (2002) (citation and internal quotation marks omitted).  But Bender cites outdated caselaw and ignores more recent Supreme Court precedent:  In *Morgan*, the Supreme Court held that while the continuing violation doctrine may apply to hostile work environment claims, *id.* at 115-22, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges," *id.* at 113.  In other words, because "[e]ach discrete discriminatory [or retaliatory] act starts a new clock for filing charges alleging that act," the continuing violation doctrine does not apply to discrimination or retaliation claims.  *Id.*; *see Harris v. Bd. of Educ. of the City Sch. Dist. of the City of N.Y.*, 230 F. Supp. 3d 88, 98 (E.D.N.Y. 2017) ("The 'continuing violation' doctrine applies only to harassment claims.  It is inapplicable to discrimination and retaliation claims." (citation omitted)).

For that reason, Bender's argument that the continuing violation doctrine saves her untimely discrimination and retaliation claims fails, and her gender discrimination and retaliation claims based on incidents that occurred before July 4, 2020, are dismissed.

### B.    Failure to State a Gender Discrimination or Retaliation Claim[5]

Title VII claims for discrimination and retaliation are analyzed under the "burden-shifting evidentiary framework" set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Littlejohn v. City of New York*, 795 F.3d 297, 312, 316 (2d Cir. 2015).  The first step of that framework requires a plaintiff to "establish a prima facie case" of discrimination or retaliation.  *Id.* at 307.

To establish a prima facie case of discrimination, a plaintiff must show "(1) that she is a member of a protected class; (2) that she was qualified for employment in the position; (3) that she suffered an adverse employment action; and [(4) that she has] some minimal evidence suggesting an inference that the employer acted with discriminatory motivation."  *Id.*  To establish a prima facie case of retaliation, "a plaintiff must present evidence that shows (1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a

_____

[5] Because Bender's gender discrimination and retaliation claims arising from incidents before July 4, 2020, are time barred, this Court considers only the incidents that occurred after that date when evaluating whether she has stated a claim for discrimination or retaliation.  Those incidents are: (1) Bender's interactions with Sarvis on July 7, 2020, *see* Docket Item 17-2 at ¶¶ 123-24; Docket Item 20-1 at ¶¶ 123-24; (2) her vehicle problems on July 22, 2020, *see* Docket Item 17-2 at ¶¶ 129-30; Docket Item 20-1 at ¶¶ 129-30; and (3) her interaction with Kinyon and subsequent resignation on August 4, 2020, *see* Docket Item 17-2 at ¶¶ 131-33; Docket Item 20-1 at ¶¶ 131-33.

causal connection between the protected activity and the adverse employment action." *Id.* at 315-16 (citation and internal quotation marks omitted).

An adverse employment action is "a materially significant disadvantage with respect to the terms of the plaintiff's employment." *Id.* at 312 n.10 (alterations and emphasis omitted) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)). An action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities" to be an adverse employment action. *Id.* (quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). "Examples of materially significant disadvantages include termination, demotion, a less distinguished title, a material loss of benefits, or significantly diminished material responsibilities." *Id.* (alternations and internal quotation marks omitted) (citing *Galabya*, 202 F.3d at 640).

USPS argues that Bender has not established a prima facie case of discrimination or retaliation because she has not shown that she suffered an adverse employment action. Docket Item 17-1 at 8-9, 19. More specifically, USPS says that it "took no action whatsoever against Bender, let alone an adverse action" such as a "suspension or termination." *Id.* Bender responds that USPS's failure to adequately address her complaints about Sarvis's harassment is the adverse employment action upon which her claims are based. Docket Item 20 at 6-7, 12-13; *see* Docket Item 1 at ¶ 36 (alleging that Bender "suffered an adverse employment action" when USPS "failed to respond to [her] complaints of harassment").

The only complaint Bender made about Sarvis's harassment in the relevant time period involved his threatening operation of a vehicle on July 7, 2020. *See* Docket Item 17-2 at ¶¶ 123-24; Docket Item 20-1 at ¶¶ 123-24. While "unchecked retaliatory co-

worker harassment" may constitute an adverse employment action if an employer allows one co-worker to harass another "because she engaged in protected activity," Bender has presented no evidence that Sarvis's July 7 harassment—or USPS's alleged failure to address that harassment—was retaliation for Bender's engaging in a protected activity. *See Drouillard v. Sprint/United Mgmt. Co.*, 375 F. Supp. 3d 245, 270 (finding that plaintiff failed to establish she had suffered an adverse employment action based on alleged harassment by her co-worker). Nor does she point to any facts suggesting that any failure to adequately address the harassment stemmed from her gender or disability.[6]

In short, Bender has not adequately shown that USPS imposed "a materially significant disadvantage" on her on or after July 4, 2020. *See Littlejohn*, 795 F.3d at 312 n.10. She therefore has failed to establish prima facie cases of sex discrimination or retaliation under Title VII, and those claims are dismissed.

### C.    Hostile Work Environment

Bender does not assert a hostile work environment claim, *see* Docket Item 1, and this Court is not inclined *sua sponte* to grant her leave to amend at this late stage. Nevertheless, the Court addresses USPS's argument that Bender's claims fail even when construed as a hostile work environment claim. *See* Docket Item 17-1 at 10-17.

"Under Title VII, an employee seeking to bring a hostile work environment claim must show [1] that she . . . is a member of a protected class; [2] that she suffered

---

[6] What is more, Sarvis's harassment on that day was not unchecked: Bender's complaint led to an investigation, *see* Docket Item 17-9, suggesting that USPS took her complaint seriously and responded appropriately rather than acting adversely against her for discriminatory or retaliatory reasons.

17

unwelcome harassment; [3] that she was harassed because of her membership in a protected class; and [4] that the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008).  "[I]t is 'axiomatic' that in order to establish a sex-based hostile work environment under Title VII, a plaintiff must demonstrate that the conduct [at issue] occurred because of her sex." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (citation omitted).

USPS argues that Bender cannot "prove that Sarvis's alleged harassment of her was because of sex."  Docket Item 17-1 at 11.  Indeed, Bender's evidence that Sarvis harassed her because of her gender is scant:  The only conduct she complains of that could be interpreted as gender-based is Sarvis's "wolf-whistles," *see* Docket Item 20 at 8-9, which alone are not "sufficiently severe or pervasive" to create a hostile work environment, *see Monterroso*, 591 F. Supp. 2d at 584; *see also Agosto v. N.Y. City Dep't of Educ.*, 982 F.3d 86, 102-04 (2d Cir. 2020) (teacher's allegations that principal would "stare" and "sneer" at him and "cat-call" him were "insufficient to create an objectively hostile workplace").  And Bender points to nothing else—for example, comments about her gender—that might connect Sarvis's wolf-whistles to his other harassment.  *See generally* Docket Item 20.  What is more, notwithstanding Bender's assertion that Sarvis treated other women badly, *see id.* at 8-9, it appears that Sarvis treated those around him badly regardless of their genders, *see* Docket Item 21 at 6 (citing examples of "Sarvis's harassment of men").[7]

---

[7] Bender admits several of the instances of Sarvis treating men badly.  *See* Docket Item 20-1 at ¶¶ 54, 86-87.  Accordingly, there is no genuine question of fact as to whether Sarvis harassed both men and women.

In short, viewed in the light most favorable to Bender, the facts of this case would not support a hostile work environment claim—even if Bender had pleaded one.

## II.     REHABILITATION ACT CLAIM

"To establish a prima facie case of discrimination under the Rehabilitation Act based on an employer's failure to accommodate a disability, a plaintiff must demonstrate that (1) [she] is a person with a disability under the meaning of the statute . . . ; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, [she] could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations." *Costabile v. N.Y. City Health and Hosps. Corp.*, 951 F.3d 77, 81 (2d Cir. 2020) (per curiam) (citation, italics, and internal quotation marks omitted).

"Generally, it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." *Id.* (alteration and citation omitted). But "where 'the disability is obvious—which is to say, if the employer knew or reasonably should have known that the employee was disabled'[—]the employer is obligated to engage in 'an interactive process with [its] employees and in that way work together to assess whether an employee's disability can be reasonably accommodated.'" *Id.* (quoting *Brady v. Wal-Mart*, 531 F.3d 127, 135 (2d Cir. 2008)). "To trigger the duty to engage [in] the interactive accommodations process, the employer must have known, or have had sufficient notice such that the employer reasonably should have known, that the employee has a disability within the meaning of the [Rehabilitation] Act, as opposed to a mere impairment." *Id.* (citing *Brady*, 531 F.3d at 134).

Bender bases her disability discrimination claim on USPS's alleged failure to reasonably accommodate her mental health conditions.  *See* Docket Item 1 at ¶¶ 28-30.  USPS argues that Bender's Rehabilitation Act claim fails for two reasons: (1) Bender did not have a disability within the meaning of the Rehabilitation Act and (2) USPS did not refuse to provide Bender reasonable accommodations.  Docket Item 17-1 at 19-22.  The Court addresses only the second of those arguments.

USPS suggests that because Bender never requested reasonable accommodations for her alleged disability, it could not have possibly denied her those accommodations.  *Id.* at 21-22.  Bender responds that "a request [for reasonable accommodations] is not required" when the employer "knew or reasonably should have known that the employee was disabled."  Docket Item 20 at 14-15 (second excerpt quoting *Brady*, 531 F.3d at 135).  And, she says, USPS knew about her alleged disability because she shared it with her supervisors.  *Id.* at 15.  But Bender's argument misses the mark.

Bender is correct that some people with disabilities need not request reasonable accommodations to have a viable failure to accommodate claim.  For example, the plaintiff in *Brady* had cerebral palsy, a disability that "manifested itself" in myriad visible ways.  *Brady*, 531 F.3d at 130.  Although the plaintiff did not request reasonable accommodations from his employer, the Second Circuit allowed him to pursue a failure to accommodate claim because the employer should have known he required accommodations.  *Id.* at 134-36.

Here, on the other hand, Bender has not established that USPS should have known that she was disabled or that she required reasonable accommodations for her

mental health conditions.  She is not like the plaintiff in *Brady*, whose disability was visible.  And while she alleges that she shared her mental health diagnoses with her supervisors, Docket Item 20 at 15, that does not show that USPS knew she was disabled:  Mental health conditions vary in severity, and an outside observer generally does not know how severe a mental illness is without being told.  So absent any evidence that Bender communicated the severity of her mental health conditions, this Court declines to find that those conditions "trigger[ed] the duty to engage the interactive accommodations process."  *See Costabile*, 951 F.3d at 81; *see id.* at 82 (finding that plaintiff failed to state a reasonable accommodation claim because he "[n]ever requested an accommodation," despite the fact that the defendants knew the plaintiff had multiple sclerosis and knew that he "took work-related disability leave on multiple prior occasions").  Accordingly, Bender's failure to request reasonable accommodations is fatal to her disability discrimination claim.

Bender's Rehabilitation Act claim therefore is dismissed.

## CONCLUSION

For the reasons stated above, USPS's motion for summary judgment, Docket Item 17, is GRANTED.  The Clerk of the Court shall close this case.

SO ORDERED.

Dated:   February 2, 2024
         Buffalo, New York


                                        _/s/ Lawrence J. Vilardo_
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE